Filed 11/18/14  P. v. Grajeda CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B244153 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA087587) |
| v. | |
| SENON GRANDE GRAJEDA et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Mark C. Kim, Judge.  Affirmed in part and reversed in part with directions.

Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant Senon Grande Grajeda.

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant Daniel Tomas Grajeda.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Mary Sanchez and David Zarmi, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

## INTRODUCTION

Defendants Senon Grande Grajeda and Daniel Tomas Grajeda appeal from judgments entered after a jury trial. The jury found Senon[1] guilty of first degree premeditated murder (Pen. Code, § 187, subd. (a)). The jury found true the allegations that the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang (*id*., § 186.22, subd. (b)(1)(C)), and that in the commission of the crime a principal intentionally discharged a firearm causing great bodily injury and death (*id*., § 12022.53, subds. (d), (e)(1)), personally and intentionally discharged a firearm (*id*., § 12022.53, subds. (c), (e)(1)), and personally used a firearm (*id*., § 12022.53, subds. (b), (e)). The trial court found true the allegations that Senon had suffered two prior serious felony convictions (*id*., §§ 667, subds. (a)(1), (b)-(i), 1170.12). The court sentenced Senon under the three strikes law to 75 years to life for the murder, plus 25 years to life for the intentional discharge of a firearm causing death, plus 10 years for the two prior serious felony convictions, for a total of 110 years to life in state prison.

The jury similarly found Daniel guilty of first degree premeditated murder and found true the gang and firearm allegations. The jury also found Daniel guilty of possession of a firearm by a felon (Pen. Code, § 12021, subd. (a)(1)) and found true the allegation that both crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang (*id*., § 186.22, subd. (b)(1)(C)). The trial court also found true the allegations Daniel had served four prior prison terms (*id*., § 667.5, subd. (b)). The trial court sentenced Daniel to 25 years to life for the murder plus an additional 25 years to life for the intentional discharge of a firearm causing death. The court sentenced Daniel to the upper term of three years for possession of a firearm by a

---

[1]     Where two people share the same last name, we refer to them by their first names to avoid confusion. (See *People v. Boyce* (2014) 59 Cal.4th 672, 680, fn. 6; *People v. Eubanks* (2011) 53 Cal.4th 110, 116, fn. 2.)

felon, plus five years for the gang enhancement and four years for the prior prison sentences. Daniel's total sentence was 62 years to life in state prison.

## FACTUAL BACKGROUND

### A.   *The Defendants*

Senon is Daniel's uncle. Senon is a member of La Rana gang and the Mexican Mafia. He has a tattoo of a black hand, signifying his Mexican Mafia membership, and is known by the moniker "Cherilo."

Daniel is a member of the Westside Wilmas gang, whose territory is the west side of Wilmington. His gang moniker is "Peanut."

### B.   *The Residents of the Wilmington Inn Motel*

The Wilmington Inn Motel is in territory claimed by the Westside Wilmas gang. Michelle Tamble was the manager of the Wilmington Inn.

The victim, Johnny Carbajal, lived at the Wilmington Inn with Melissa Garcia and their two children. Johnny was a member of the Westside Wilmas and had "W.S." tattooed on his left arm.

Johnny's mother, Stella Carbajal, and her husband, John Beck, also lived at the Wilmington Inn. Stella was a member of the Westside Wilmas. Beck, who had been incarcerated several times, had been a member of the 18th Street gang and was known by the moniker "Psycho." Beck had met Senon years earlier when both were incarcerated. He knew Senon by the moniker "Cherilo" and knew that Senon was a senior member of the Mexican Mafia.

Enedina Torres and her boyfriend, Raul Benitez, were staying with another tenant at the Wilmington Inn. Benitez was a member of the Eastside Wilmas, and Torres was an associate of the Westside Wilmas. Torres is Daniel's sister and Senon's niece. Beck learned in November 2010 that Torres was Senon's niece and called Senon to say hello.

Torres bragged to some of the tenants at the Wilmington Inn that her uncle ranked high in the Mexican Mafia.

The Westside Wilmas' gang color is blue, and the gang considers it a sign of disrespect to wear red, the color of its rival gang, the Eastside Wilmas. Benitez had been wearing red clothing, and other tenants had asked him to remove it. He did not get upset and complied with their requests.

C.    *The Murder*

At 8:00 p.m. on November 29, 2010 Johnny noticed that Benitez was wearing red clothing and told him to take it off. Benitez apologized and complied. Torres, who had been hit by a car the night before and was waiting for a ride to the hospital, sat nearby in Stella's wheelchair. Torres got angry and told Johnny to leave Benitez alone. Johnny told Torres to get out of his mother's wheelchair. Torres got up and left with Benitez.

A little while later, Senon arrived at the Wilmington Inn to take Torres to the hospital. While Senon was taking Torres to his car, Johnny was arguing with Benitez. Senon got upset with Johnny and told him that he was Torres' uncle, and Johnny should show him some respect. Senon told Benitez to get in the car. Once Senon, Torres, and Benitez were in the car, Senon complained that people did not have respect for their elders. Senon drove the car around the corner and parked. Then he and Benitez got out and returned to the Wilmington Inn, leaving Torres in the car.

Beck had witnessed the initial confrontation between Johnny and Benitez and then returned to his room. Later, Stella's cousin came to the room and told Beck to come to the front of the building, where Johnny was talking to Senon. Beck was concerned because Johnny was "special ed, he don't really understand too much." Beck went quickly toward the front of the building.

Beck heard Senon say, "Yeah, there is a lot of people that are running their mouths around there, about shit. I am about something. I will be back." Johnny came into the motel and told Beck that Senon was angry with him. Beck told Johnny to go into Tamble's office. Johnny went to join Tamble, Garcia, and others in the office.

4

Beck went outside to talk to Senon.  Senon put his hands up and told Beck to stay back.  Beck said, "Cherilo, it's me, Psycho.  Psycho from 18th Street."  After the two of them had talked for a while, Beck asked if everything was "cool."  Senon said it was; he was just there to take his niece to the hospital because she had injured her ankle.  Beck told him, "Oh yeah, she is sitting in my wife's wheelchair in there, but my son got mad and told her to get out of it, only because she has had three or four wheelchairs stolen already."

Senon made a call on his cell phone.  About five minutes later, a black SUV arrived in front of the Wilmington Inn.  Daniel and another man got out of the SUV and walked over to Senon and Beck.  Daniel whispered something to Senon and put his hand inside his waistband, where he had what appeared to be a gun.  Senon told Benitez to unlock the door to the motel.  Benitez unlocked the door, and Senon, Daniel, and the other man went inside.  Beck, who remained outside, saw Senon, Daniel, and the other man enter Tamble's office.

Tamble asked the men if she could help them, but they ignored her.  Johnny was sitting with Garcia and talking on his cell phone.  Senon told him to come outside and fight.  Johnny refused, saying that he did not want to fight.  Senon slapped Johnny and called him a "bitch."  Johnny and Garcia got up to fight back.  Senon knocked Garcia to the floor and began to fight with Johnny.  When Garcia tried to get up, Daniel grabbed her hair with his left hand and held her down.  Daniel pulled a gun from his waistband with his right hand and shot Johnny twice.  Senon, Daniel, and the other man ran outside, got into the SUV, and drove away.  Tamble called 911.

When Beck heard the gunshots, he ran back inside.  Someone told him, "they shot your kid.  They killed him."  Beck went into Tamble's office and saw Johnny sprawled on a love seat.  Johnny was bloody and his eyes were shut.  Beck began shaking Johnny, but people in the room told him that Johnny was already dead.  Johnny opened his eyes and told Beck, "It will be alright."  Then he died.  An autopsy revealed that one of the bullets passed through Johnny's kidney and spine, and the other passed through his colon, small bowel, and liver.  Johnny died of massive blood loss.

According to Garcia, who testified as a defense witness for Daniel, Johnny was not a gang member. He was disabled and stayed at home with their children. On November 29 Johnny got into an argument with Torres' boyfriend Benitez, which made Torres angry. Garcia knew that Torres was associated with the Westside Wilmas and La Rana gangs, and that Torres had bragged her uncle was a member of the Mexican Mafia. Torres said that if anyone messed with her, she would call her uncle.

At 8:00 p.m., when Garcia and Johnny were in Tamble's office, Johnny got into an argument with two men that Garcia had never seen before. When one man slapped Johnny and called him a bitch, Garcia tried to intervene. The man punched her in the face and knocked her down. Someone pulled her hair back and then she heard gunshots. According to Garcia, Johnny never got up to fight anyone because he was not a fighter.

After the shooting, she heard people say that the shooter was "Clever" from the Westside Wilmas. Garcia testified that the shooter had green or hazel eyes and a tattoo under his right eye based on what other people had told her; she had not been able to see the shooter's face because he was wearing a hood.[2] Garcia acknowledged that she was afraid of retaliation if she identified anyone and had asked the prosecutor not to call her as a witness.

D.    *The Investigation*

Los Angeles Police Department Detectives Isidro Rodriguez and Antonio Batres interviewed Tamble after the shooting. They showed her a photographic lineup (a "six-pack") that included a photograph of Senon's cousin, Raymundo. Tamble initially identified this photograph because Raymundo looked like the man who had slapped Johnny, but Tamble was not sure of her identification. Detective Rodriguez showed her a second six-pack containing Senon's photograph, and she identified him as the man who had slapped Johnny.

---

**2**      In a police interview, Garcia first indicated that the shooter's tattoo was under his left eye, the later indicated it was under his right eye. Daniel's tattoo is under his left eye.

6

Tamble described the shooter as a light-skinned Hispanic man in his mid-20's, five-foot-seven, with a stocky build and round face, and a tattoo under his left eye. The police showed her a six-pack that did not have Daniel's photograph in it. She was unable to identify the shooter, because none of the men in the photographs had a tattoo under his left eye.

Detective Rodriguez interviewed Beck on December 1. Beck identified Senon from a photographic lineup. Because Beck stated that the man with the gun had a tattoo under his eye, when preparing the six-pack that included a photograph of Daniel, Detective Rodriguez drew tattoos under the eyes of the other men. Beck identified Daniel as the man with the gun. Beck acknowledged that he originally identified the man with the gun as "Clever," but he explained that "Clever" and "Peanut" were related and he got them confused. "Everybody does. The whole *barrio* does. All the Westside Wilmas does." Beck identified Senon and Daniel at the preliminary hearing and at trial.[3]

Detectives Rodriguez and Cortez interviewed Torres on December 15.[4] Torres acknowledged that if someone disrespected a member of Senon's family, there would be consequences.

On December 16 Tamble saw a photograph of Daniel in a gang injunction letter she received as manager of the Wilmington Inn. She recognized him as the shooter and subsequently identified him from a photographic lineup. Tamble identified both Senon and Daniel at the preliminary hearing and at trial.[5]

---

[3]    The police relocated Beck after the shooting.

[4]    Torres was incarcerated at the time of trial because she had been convicted of grand theft and had violated parole.

[5]    The police also relocated Tamble because she had been threatened after her preliminary hearing testimony. She was impeached with four felony convictions between 1998 and 2004.

E.     *The Cell Phone Records*

Cell phone records show the phone numbers involved in a call, the time and duration of a call, the cell site where the call originated, and the site where the call terminated.  On November 29, 2010 at 7:52 p.m., there was a 31-second call from Senon's cell phone to Daniel's cell phone.  The call originated and terminated from a cell phone tower located in the general vicinity of the Wilmington Inn.

At 7:54 p.m. there was a second call from Senon's cell phone that lasted 504 seconds (just under eight and one-half minutes).  This call also originated in the general vicinity of the Wilmington Inn.  The call terminated at 8:02 p.m. at a cell phone tower east of the tower where the call had originated.

Cell phone records for Daniel's phone showed an incoming call from Senon's cell phone at 7:53 p.m.  At 7:56 p.m., there was an outgoing call from Daniel's cell phone to Senon's cell phone.  This call originated at a cell phone tower close to the Wilmington Inn but terminated at a tower east of there.

F.     *The Surveillance and Wiretaps*

Torrance Police Officer David Ybarra began wiretapping Senon's and Daniel's cell phones in December in connection with another investigation.  On December 13 a woman called Senon saying she had been unable to contact Torres for about a week and a half.  She explained she was worried, "'Cause I like I left Wilmington because, dude, like I was telling her people were like—like I told her who was trying to point fingers . . . because they brought her portfolio, the detectives.  And then I bounced."  Senon told her, "don't talk about that."

On December 15 Senon's wife called him.  She was worried about him and angry that she did not know where he was.  He told her, "Well, I'm holding the baby right here with me because Peanut's taking care of business and I'm at their home, all right?"  His

wife complained, "nothing else matters to you but that Eme shit,"**6** and it "takes precedence over everything, nothing else matters to you."

On December 16 Torres called Senon and told him that Benitez had been arrested for murder. Torres told him that "Somebody—somebody told where we were." Senon asked, "Who? It's got to come out on paperwork." Torres agreed, but when she started to discuss it further, Senon warned her, "don't say too much on the phone."

G.   *The Gang Evidence*

1.   Rene Enriquez

Rene Enriquez testified at trial as a gang expert for the prosecution. Enriquez became a member of the Arta gang when he was 13 years old, and was a member of the Mexican Mafia for 17 years. He committed or participated in a number of murders for the Mexican Mafia, and he was serving life terms in prison for two of them. Enriquez left the Mexican Mafia and was now cooperating with law enforcement. He has testified in court cases, lectured law enforcement, taught a college course, and collaborated on books about his life and the Mexican Mafia.

Enriquez testified that there are 150 to 200 Mexican Mafia members in federal and state prisons. In order to become a member of the Mexican Mafia, one must be sponsored by a member and voted in by the members. The primary symbol of the Mexican Mafia is the black hand of death. Only members can wear a black hand tattoo; a nonmember wearing the tattoo would be killed. Both Enriquez and Senon had a black hand tattooed on the left side of their chests.

The Mexican Mafia controls other gangs, whose members, Surenos, are the foot soldiers of the Mexican Mafia. There are about 50,000 Surenos in California. Surenos loyal to the Mexican Mafia use the number 13, which refers to the 13th letter of the alphabet, M, pronounced "eme." By committing crimes on behalf of the Mexican Mafia,

---

**6**   As we explain, "Eme" signifies the Mexican Mafia.

Surenos elevate their status within the gang culture and the status of their gangs. They also become eligible for future membership in the Mexican Mafia. Surenos must be willing to kill in order to gain respect from the Mexican Mafia.

Enriquez met Senon in Folsom State Prison, before Enriquez became a member of the Mexican Mafia, and they became close friends. Senon gave Enriquez a picture of his black hand tattoo. He wrote on the picture: "Para mi homie, René, Arta 13. Con respecto, en parte de tu homie, Cherilo, La Rana." There was a small "M" instead of a dot over the "i" in "Cherilo." Only Mexican Mafia members were allowed to use an "M" instead of a dot over the "i."

According to Enriquez, the Grajeda family was well known in the Mexican Mafia because Senon's two brothers were also members. Enriquez did not know Daniel but recognized Daniel's tattoos as referring to the Westside Wilmas. In addition, a "13" tattooed on Daniel's elbow identified him as a soldier for the Mexican Mafia.

In 1985 Senon told Enriquez that he had ordered a stabbing in Folsom State Prison of someone who had disrespected a family member. The victim was accidentally killed, which Senon subsequently approved. Senon ordered Enriquez to kill a Mexican Mafia member who had beaten up his Mexican Mafia cellmate without permission from the organization. Before Enriquez could kill the man, the man was removed from the Mexican Mafia hit list. A few years later, in Chino State Prison, Senon told Enriquez about his unsuccessful attempt to kill a man for dropping out of the Mexican Mafia. Later, at Corcoran State Prison, Enriquez told Senon that Senon's brother had been stabbed for violating Mexican Mafia rules. Senon told Enriquez that if Enriquez could get him near his brother, he would personally kill his brother.

Enriquez testified that carrying a weapon or committing an act of violence in front of a Mexican Mafia member without that member's permission was a capital offense. Relatives of the member are not exempt from the requirement of permission. The prosecutor asked Enriquez, "if you had . . . a Sureno who committed a shooting/homicide right in front of the Mexican Mafia member, without that Mexican Mafia member's permission, what if that person were a relative of the Mexican Mafia member, would that

10

absolve them from the death sentence that they would otherwise receive as a result of violating the Mexican Mafia rules? Enriquez answered, "No, even relatives are subject to the rules of the Mexican Mafia. One rule is that you have to kill your brother, if it is called for." The prosecutor then asked if "a Sureno, who is a relative of the Mexican Mafia member, did a homicide, shooting, killing, in front of that Mexican Mafia member, and then the Mexican Mafia member came over to their house within the next week or two, would that indicate to you that the killing had been ordered by the Mexican Mafia member?" Enriquez said it "would indicate to me that there was a prearranged agreement between the two individuals to perform the act in question."[7]

Based on a hypothetical question mirroring the facts of this case, Enriquez opined that there was a prearranged agreement that the Sureno would bring a gun and kill the person who had disrespected the Mexican Mafia member and his family member, so that the killing was at the direction of, for the benefit of, and in association with the Mexican Mafia. The killing "lays the foundation for terror within the Hispanic gang subculture. The gang members understand that if they don't surrender their autonomy, if they don't agree to the Mexican Mafia commands, if they don't provide the respect that's demanded by the organization, they will be killed. That's how they benefit." The killing also sends a message to the community at large "that the Mexican Mafia is capable of killing individuals who it desires killed."

### 2. Law Enforcement Gang Testimony

Several police officers testified about contacts with Daniel and Senon where the two of them admitted gang affiliation. Torrance Police Officer Tyrone Gribben testified that on December 3, 2009 he conducted a field identification stop of Daniel, who admitted that he was a member of the Westside Wilmas and that his gang moniker was

---

[7] The questions were based on evidence of the December 15 telephone call from Senon's wife, in which Senon stated he was at Peanut's home holding the baby while Peanut took care of business.

"Peanut." Torrance Police Officer Sean O'Rourke testified that he conducted field identification stops of Senon on August 28, 2010 and November 19, 2010, and Senon admitted he had been a member of the La Rana gang and was now a member of the Mexican Mafia. Senon said that he was known as "Big Homie" and "Cherilo" among Wilmington area gang members. Senon also told Officer O'Rourke that he had committed assaults both in prison and on the streets, and his black hand tattoo signified that he had committed five murders.

The prosecution also presented expert testimony on gang culture from two members of law enforcement. Detective Christopher Brandon of the Los Angeles County Sheriff's Department, major crimes bureau, testified about the Mexican Mafia and Sureno gangs. He agreed with Enriquez's testimony regarding the operation of the Mexican Mafia. In Detective Brandon's opinion, Senon was a member of the Mexican Mafia on November 29, 2010.

Los Angeles Police Officer Mark Maldonado testified as an expert on the Westside Wilmas. In the 1980's the Wilmas split into two gangs, the Westside Wilmas and the Eastside Wilmas. Both are Sureno gangs. The Westside Wilmas have about 550 members and use "WSW" as their gang symbol.

Officer Maldonado explained that the "W" tattooed on Daniel's head, the WSW tattoo on the back of his neck, the Wilmas tattoo across his chest, and the "13" tattooed on his elbow, signified his allegiance to the Mexican Mafia. Based on Daniel's tattoos, the officer's prior contacts with Daniel, and information from other officers, Officer Maldonado believed that Daniel was a Westside Wilmas member. Officer Maldonado also testified that Daniel has brown eyes. Officer Maldonado stated he was aware of two Westside Wilmas members having the moniker "Clever." They were brothers and cousins of the Grajedas. Neither had a facial tattoo.

Officer Maldonado opined that if a member of the Westside Wilmas shot a second member of that gang in the presence of a member of the Mexican Mafia, whom the victim had disrespected, the shooting would have been done for the benefit of, at the direction of, or in association with, the Westside Wilmas. He explained that the shooting

12

would raise the gang member's status and the status of the gang in the eyes of the Mexican Mafia. If the disrespectful gang member was not killed, the Mexican Mafia could "green light" the gang, meaning that other gangs could attack or kill the gang's members.

### 3. Defense Expert Gang Testimony

Alex Alonso testified as a gang expert for the defense. Alonso was affiliated with the sociology department at the University of Southern California and had been studying gangs, including the Mexican Mafia, since 1993. He explained that not all Hispanic gangs in southern California were associated with the Mexican Mafia. The Mexican Mafia is most interested in gangs whose territory have a high concentration of drugs and drug users, where the Mexican Mafia can make money. Hispanic gangs in the Harbor Cities area, including the Westside Wilmas, were associated with the Mexican Mafia.

Alonso opined that not all crimes committed by gang members are for the benefit of their gang, and that one has to look at the circumstances surrounding a crime to determine if it was committed for the benefit of the gang. A member of the Mexican Mafia may kill someone over an issue that has nothing to do with the Mexican Mafia. The Mexican Mafia would not get involved in a dispute between one of its members and a local gang member unless the dispute involved Mexican Mafia business.

In response to a hypothetical question based on the facts of this case, Alonso opined that the killing was not necessarily for the benefit of the Mexican Mafia. He noted that traditional Mexican Mafia killings are well-planned executions rather than spontaneous events, are related to Mexican Mafia business or violations of Mexican Mafia rules, and are done in a more secretive manner that will allow the killer to escape. The killing in this case could have been based on a personal conflict rather than for the benefit of the Mexican Mafia. Alonso acknowledged, however, that disrespecting a Mexican Mafia member is a violation of Mexican Mafia rules and that there is a range of possible punishments, including death, depending on the severity of the violation.

Alonso also acknowledged that a killing by a Sureno gang member with the approval of a Mexican Mafia member could increase his status in the gang and benefit the gang. He stated, however, that not all Sureno gang members want to be part of the Mexican Mafia. Alonso also testified that if a Sureno gang member killed someone in the presence of a Mexican Mafia member without permission, the Mexican Mafia member would be upset. Alonso explained that if "a family member commits this murder without the blessing of the Mexican Mafia member, in the Mexican Mafia member's presence," one would not expect the Mexican Mafia member "to be just sort of hanging out with the person who committed the murder within a couple of weeks at their house."

## DISCUSSION

A. *Unduly Prejudicial Gang Evidence*

Senon contends the trial court abused its discretion in admitting excessive and unduly prejudicial gang evidence. In particular, Senon points to the evidence that he had been involved in other killings and would kill his brother for the Mexican Mafia if he had the opportunity to do so. We conclude the trial court did not abuse its discretion in admitting the gang evidence.

1. Proceedings in the trial court

Before trial, counsel for Senon filed a motion in limine to exclude or limit Enriquez's testimony on the grounds that he was not qualified to testify as an expert witness, the basis of his opinions was improper, and his testimony was irrelevant, misleading, and unduly prejudicial. Counsel also filed a motion in limine to limit the number of expert witnesses regarding gangs and the Mexican Mafia. Counsel for Senon argued that, because Beck and Detective Brandon had testified at the preliminary hearing about the activities and operations of the Mexican Mafia, Enriquez's testimony was cumulative and its prejudice substantially outweighed its probative value. At the hearing

14

on the motions, counsel for Senon also argued that Detective Brandon could testify about the predicate criminal acts necessary to prove the gang allegation, and that Enriquez's testimony was inflammatory and sensational.

The trial court indicated that it had read the preliminary hearing transcript and would allow the gang evidence. On the issue of cumulative testimony, the court stated that the three witnesses would be testifying about different matters. Enriquez would be testifying about his personal knowledge of and communication with Senon and would corroborate Detective Brandon's testimony. Counsel for Senon conceded that this testimony was proper, but stated "Enriquez has elaborated on [that], talking about his experience with other killings and other murders that occurred . . . that has no . . . relevance to this case. To establish that he is a Mexican Mafia and he knows him, I think that's what it should be limited [to]. I don't have a problem with that." Counsel argued that, with respect the other crimes Enriquez claimed Senon committed, there was no evidence to substantiate Enriquez's claims, and the testimony was unnecessary because the law enforcement expert witnesses could testify about the predicate crimes for the gang enhancement. Counsel for Senon emphasized that Enriquez's testimony regarding other crimes Senon may have committed was "unreliable, based on hearsay statements and is speculation." The trial court stated that counsel could challenge the reliability of Enriquez's testimony on cross-examination, and that counsel's objections went to the weight of the evidence, not its admissibility.

Counsel for Senon subsequently filed another motion to exclude Enriquez's testimony. Counsel argued that certain prior bad acts about which Enriquez would testify were not similar enough to the charged crime to be admissible under Evidence Code section 1101, subdivision (b), and that the court should exclude the evidence under Evidence Code section 352 because its prejudicial impact substantially outweighed its probative value. The trial court ruled the prosecution could introduce evidence only of (1) a hit Senon had ordered, (2) Mexican Mafia infighting and stabbing in prison, and (3) the stabbing of Senon's brother. The court found that the probative value of this

15

evidence with respect to the gang allegations outweighed its prejudicial effect.[8]  The court ruled, however, that the prosecution could not introduce evidence that Senon admitted killing someone even though he had been acquitted of that murder.

> 2.  Applicable Law

"Only relevant evidence is admissible at trial.  (Evid. Code, § 350.)  Under Evidence Code section 210, relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the

---

[8]  The trial court later instructed the jury pursuant to CALJIC Nos. 2.50 and 17.24.3 regarding the limited purpose for which the other crimes evidence had been admitted.  CALJIC No. 2.50 provided:  "Evidence has been introduced for the purpose of showing that the defendant committed crimes other than that for which he is on trial; and in addition evidence has been introduced for the purpose of showing criminal street gang activities, and of criminal acts by gang members, other than the crimes for which defendants are on trial.  [¶]  This evidence, if believed, may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes.  It may be considered by you for the limited purpose of determining if it tends to show:  [¶]  The existence of the intent which is a necessary element of the crime charged; [¶]  A motive for the commission of the crime charged;  [¶]  That the crime or crimes charged were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.  [¶]  For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case.  [¶]  You are not permitted to consider such evidence for any other purpose."

CALJIC No. 17.24.3 provided:  "Evidence has been introduced for the purpose of showing criminal street gang activities, and of criminal acts by gang members, other than the crimes for which defendants are on trial.  [¶]  This evidence, if believed, may not be considered by you to prove that defendant is a person of bad character or that he has a disposition to commit crimes.  It may be considered by you for the limited purpose of determining if it tends to show that the crime or crimes charged were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.  It may also be used by you to determine if there was a motive to commit a crime, or if a crime is a natural and probable consequence of another crime.  [¶]  For the limited purpose for which you may consider this evidence, you must weigh it in the same manner as you do all other evidence in the case.  [¶]  You are not permitted to consider such evidence for any other purpose."

action.'  A trial court has 'considerable discretion' in determining the relevance of evidence.  [Citation.]  Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects.  [Citation.]  An appellate court reviews a court's rulings regarding relevancy and admissibility under Evidence Code section 352 for abuse of discretion.  [Citation.]  We will not reverse a court's ruling on such matters unless it is shown '"the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."  [Citation.]'  [Citation.]"  (*People v. Merriman* (2014) 60 Cal.4th 1, 74.)

"Gang evidence, including expert testimony, is relevant and admissible to prove the elements of the substantive gang crime and gang enhancements.  [Citation.]"  (*People v. Williams* (2009) 170 Cal.App.4th 587, 609; see *People v. Vang* (2011) 52 Cal.4th 1038, 1048 ['"[e]xpert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement"].)  "'Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related.  [Citation.]'  [Citation.]"  (*People v. Memory* (2010) 182 Cal.App.4th 835, 858; see *People v. Ruiz* (1998) 62 Cal.App.4th 234, 239 ["gang membership evidence" is admissible "when the very reason for the crime is gang related"].)  "Consequently, gang evidence may be relevant to establish the defendant's motive, intent or some fact concerning the charged offenses other than criminal propensity as long as the probative value of the evidence outweighs its prejudicial effect."  (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223; see *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 ["[e]vidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime"].)

Because of its potential for prejudice, however, "'[g]ang evidence should not be admitted at trial where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense.' [Citation.]" (*People v. Albarran*, *supra*, 149 Cal.App.4th at p. 223; see Evid. Code, § 1101, subd. (a).) Thus, "even if the evidence is found to be relevant, the trial court must carefully scrutinize gang-related evidence before admitting it because of its potentially inflammatory impact on the jury. [Citations.]" (*Albarran*, *supra*, at p. 224; see *People v. Carter* (2003) 30 Cal.4th 1166, 1194 ["[a]lthough evidence of a defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged—and thus should be carefully scrutinized by trial courts—such evidence is admissible when relevant to prove identity or motive, if its probative value is not substantially outweighed by its prejudicial effect"].) "The trial court must find that the evidence has substantial probative value that is not outweighed by its potential for undue prejudice. [Citations.]" (*People v. Williams*, *supra*, 170 Cal.App.4th at p. 610; see *People v. Jones* (2013) 57 Cal.4th 899, 930 ["'"'[b]ecause evidence of other crimes may be highly inflammatory, its admissibility should be scrutinized with great care'"'"].)

### 3. Analysis

Senon acknowledges that the trial court properly admitted expert testimony regarding the operations of Mexican Mafia and the crimes committed by Mexican Mafia members, both to prove the motivation for the murder and to prove the elements of the gang allegation. (See *People v. Vang*, *supra*, 52 Cal.4th at p. 1050, fn. 5 ["[i]t has long been settled that expert testimony regarding whether a crime was gang related is admissible" because "[s]uch matters are sufficiently beyond common experience that expert testimony would assist the jury"]; *People v. Lindberg* (2008) 45 Cal.4th 1, 46 ["'[t]he subject matter of the culture and habits of criminal street gangs' satisfies the criterion of admissible expert testimony under Evid. Code, § 801"]; *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550 [expert testimony on gangs is admissible "to show

18

the 'motivation for a particular crime, generally retaliation or intimidation' and 'whether and how a crime was committed to benefit or promote a gang'"].)  Senon does not challenge the admissibility of the testimony of Detective Brandon or even of Enriquez with respect to the way the Mexican Mafia operates, Senon's membership in the Mexican Mafia, or his motive for having Johnny killed.

Senon argues, however, that Enriquez's testimony about Senon's prior uncharged criminal activity was inadmissible under Evidence Code section 1101, subdivision (b) (section 1101(b)), cumulative to Detective Brandon's testimony concerning predicate acts by Mexican Mafia members that the People introduced to prove the gang allegation, and inadmissible under Evidence Code section 352 (section 352).  Specifically, Senon argues that the trial court abused its discretion in admitting Enriquez's testimony that (1) in 1985 Senon told Enriquez that he had ordered a stabbing in Folsom State Prison of an inmate who had disrespected a family member; (2) Senon ordered Enriquez to kill a Mexican Mafia member who had attacked his cellmate without permission from the Mexican Mafia; (3) Senon had tried to kill a man for dropping out of the Mexican Mafia; and (4) Senon's statement that he would kill his brother for violating Mexican Mafia rules.

Senon first argues that this evidence was inadmissible under section 1101(b) because the uncharged and charged crimes do not "'share common features.'"  (*People v. Walker* (2006) 139 Cal.App.4th 782, 804.)  However, "[t]he probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus.  [Citations.]"  (*People v. Demetrulias* (2006) 39 Cal.4th 1, 15; see *People v. McCurdy* (2014) 59 Cal.4th 1063, 1097 ["probative value of uncharged conduct as evidence of motive does not necessarily depend on the similarities between the charged and uncharged conduct, provided there is a direct logical nexus"].)  With respect to motive, "charged and uncharged crimes need only be 'sufficiently similar to support the inference that the defendant "'probably harbor[ed] the same intent in each instance.' [Citations.]"'  [Citation.]"  (*Demetrulias*, *supra*, at p. 15, citing *People v. Ewoldt* (1994) 7 Cal.4th 380, 402.)

19

The charged and uncharged crimes here had a direct logical nexus: all involved a motive to punish someone for violating Mexican Mafia rules. The fact that Senon ordered the stabbing or killing of individuals who violated the rules, and was even willing to kill his brother for such a violation, showed that Senon took such violations seriously. The uncharged crimes thus tended to show that Senon's motive in ordering and participating in the murder of someone who had disrespected him and his niece was gang-related, rather than a personal vendetta. (See *People v. McKinnon* (2011) 52 Cal.4th 610, 655 ["'[t]he People are entitled to "introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent"'"]; *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1212 [evidence that the defendant took part in prior gang-related drive-by shooting was relevant to prove defendant's motive in current drive-by shooting was gang-related]; *People v. Funes* (1994) 23 Cal.App.4th 1506, 1518 [evidence of prior gang activity was relevant to the defendant's motive for murdering victim].)

Senon next argues that, even if the other crimes evidence was admissible under section 1101(b), the trial court abused its discretion in refusing to exclude it under section 352 as unduly prejudicial. "'Prejudice,' as used in . . . section 352, is not synonymous with damaging. [Citation.]" (*People v. McCurdy*, *supra*, 59 Cal.4th at p. 1095.) It "'is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.'" (*People v. Johnson* (2013) 221 Cal.App.4th 623, 636.) Rather, "prejudice" as used in section 352 "refers to evidence that uniquely tends to evoke an emotional bias against the defendant as an individual, and has little to do with the legal issues raised in the trial. [Citation.]" (*McCurdy*, *supra*, at p. 1095; accord, *Johnson*, *supra*, at p. 636.)

Senon argues that the other crimes evidence here was prejudicial under section 352 because it was "[e]xtremely inflammatory," "had no connection with the charged crime," and "portrayed [him as] a ruthless killer who has no compunction about taking human life so that a parasitic criminal organization can terrorize the prisons and the streets." There is some truth to Senon's characterization of the other crimes evidence as

20

inflammatory. Nevertheless, as explained, the evidence had a connection with charged crime in the context of the motive for the gang killing and had everything to do with the issues raised in the trial. In addition, the evidence regarding the charged crime portrayed Senon in exactly the same light as the evidence regarding the uncharged crimes: Senon orchestrated an attack on a disabled, unarmed gang member who did not even want to fight merely because the gang member had disrespected Senon and his niece. Because evidence of Senon's prior crimes was relevant to the motive for the charged crime and was not inflammatory or sensational when compared to evidence of the charged crime, and because the trial court gave appropriate limiting instructions pursuant to CALJIC Nos. 2.50 and 17.24.3, the trial court did not abuse its discretion in admitting the evidence under section 352. (See *People v. Montes* (2014) 58 Cal.4th 809, 860 ["[b]ecause the gang evidence was highly probative in this case, and the trial court gave a limiting instruction designed to lessen the risk of undue prejudice, we cannot say the trial court's decision to allow the gang [motive] evidence exceeded the bounds of reason"].)[9]

---

[9] *People v. Albarran*, *supra*, 149 Cal.App.4th 214, on which Senon relies, is distinguishable. In that case there was "nothing inherent in the facts of the shooting to suggest any specific gang motive." (*Id*. at p. 227, fn. omitted.) Therefore, the bulk of the gang evidence "was irrelevant to the underlying charges and obviously prejudicial. Evidence of [the defendant's] gang involvement, standing alone, was sufficient proof of gang motive. Evidence of threats to kill police officers, descriptions of the criminal activities of other gang members, and reference to the Mexican Mafia had little or no bearing on any other material issue relating to [the defendant's] guilt on the charged crimes and approached being classified as overkill. While the court did admonish the jury concerning the proper use of the gang evidence, certain gang evidence admitted was so extraordinarily prejudicial and of such little relevance that it raised the distinct potential to sway the jury to convict regardless of [the defendant's] actual guilt." (*Id*. at p. 228, fn. omitted.) Here, by contrast, "'the very reason for the underlying crime, that is the motive, is gang related'" (*People v. Memory*, *supra*, 182 Cal.App.4th at p. 858; see *People v. Ruiz*, *supra*, 62 Cal.App.4th at pp. 239-240), and specifically Mexican Mafia-related.

21

B. *Refusal To Instruct on Voluntary Manslaughter Based on Imperfect*
*Self-Defense or Defense of Another*

Counsel for Daniel, joined by counsel for Senon, asked the court to instruct the jury on the imperfect self-defense theory of voluntary manslaughter, based on an honest but unreasonable belief that his life was in imminent danger from the victim. The trial court refused to give the instruction, finding "that there is insufficient evidence to support [a] voluntary manslaughter instruction based on the theory of imperfect self-defense."

"A trial court must instruct on all lesser included offenses supported by substantial evidence. [Citations.] The duty applies whenever there is evidence in the record from which a reasonable jury could conclude the defendant is guilty of the lesser, but not the greater, offense. [Citations.] That voluntary manslaughter is a lesser included offense of murder is undisputed. [Citations.] [¶] Imperfect self-defense, which reduces murder to voluntary manslaughter, arises when a defendant acts in the actual but unreasonable belief that he is in imminent danger of death or great bodily injury. [Citations.]" (*People v. Duff* (2014) 58 Cal.4th 527, 561-562.) Substantial evidence requiring instruction on the lesser included offense of voluntary manslaughter is "'"'evidence from which a jury composed of reasonable [persons] could . . . conclude[]'"' that the lesser offense, but not the greater, was committed. [Citations.]' [Citation.]" (*People v. Moye* (2009) 47 Cal.4th 537, 553.)

Senon and Daniel acknowledge that the imperfect self-defense doctrine "'may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified.'" (*People v. Randle* (2005) 35 Cal.4th 987, 1001, overruled on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1201; accord, *People v. Enraca* (2012) 53 Cal.4th 735, 761; *People v. Frandsen* (2011) 196 Cal.App.4th 266, 272-273.) This rule applies even where the victim escalates matters in response to the initial assault. (*Frandsen*, *supra*, at p. 272.) Senon and Daniel, however, rely on the principle that, "'[w]here the original aggressor is not guilty of a deadly attack, but of a simple assault or trespass, the victim has no right to use deadly or

22

other excessive force,'" and that "'[i]f the victim uses such force, the aggressor's right of self-defense arises. . . .' [Citation.]" (*People v. Quach* (2004) 116 Cal.App.4th 294, 301; see *Frandsen*, *supra*, at p. 273 ["[o]nly when the victim resorts to *unlawful* force does the defendant-aggressor regain the right of self-defense"].)

Senon asserts that "the deputy medical examiner's testimony established that [Johnny] may have been leaning to his right when he was shot, which would have been consistent with '[g]oing for a gun.'" Johnny was a Westside Wilmas gang member, and Alonso "testified that some criminal street gang members keep guns readily available for use in the case of an emergency." Therefore, Senon argues, there was "evidence from which reasonable jurors could conclude that Daniel Grajeda may have believed that he needed to employ deadly force in order to defend [Senon] because [Johnny] was escalating the force used in the altercation and was reaching for a concealed gun to shoot [Senon]."

The problem with this theory is that there was no evidence that Johnny was reaching for a gun, looked like he was going for a gun, or that Daniel believed Johnny was reaching for a gun. Senon refers to the following testimony by the medical examiner regarding the angle of Johnny's gunshot wounds: "Q Now, if I were in a struggle with somebody, perhaps, or if I saw the gun and kind of leaned a little bit to my right, either because I saw the gun and I was trying to move away or because I was struggling with somebody. [¶] A Right. [¶] Q If my upper torso is basically sort of tilted away from you, could that explain the 30-degree angle that you are seeing? [¶] A Yes, it could." This testimony is about a bullet angle, not a gang member reaching for a gun.

Thus, Senon and Daniel's theory of imperfect self-defense was based on speculation, not substantial evidence. Because, as in *People v. Manriquez* (2005) 37 Cal.4th 547, there was no evidence, let alone substantial evidence, that Daniel "'*actually, but unreasonably, believed he was in imminent danger of death or great bodily injury*' [citation], the evidence clearly was insufficient to require the giving of defendant's requested instruction regarding imperfect self-defense. [Citation.] We therefore

23

conclude the trial court correctly refused to instruct the jury on imperfect self-defense." (*Id.* at p. 582.)

         C.     *Instruction on the Natural and Probable Consequences Doctrine*

The trial court instructed the jury pursuant to CALJIC No. 3.02: "One who aids and abets another in the commission of a crime is not only guilty of that crime, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime[s] originally aided and abetted. [¶] In order to find the defendant guilty of the crime of Murder under this theory, as charged in Count 1, you must be satisfied beyond a reasonable doubt that:

"1. The crime of Assault or Assault with Firearm was committed;

"2. That the defendant aided and abetted that crime;

"3. That a co-principal in that crime committed the crime of Assault or Assault with Firearm; and

"4. The crime of Murder was a natural and probable consequence of the commission of the crime of Assault or Assault with Firearm.

"In determining whether a consequence is 'natural and probable,' you must apply an objective test, based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected likely to occur. The issue is to be decided in light of all of the circumstances surrounding the incident. A 'natural' consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. 'Probable' means likely to happen.

"You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that the defendant aided and abetted the commission of an identified and defined target crime and that the crime of Murder was a natural and probable consequence of the commission of that target crime."

The trial court also instructed the jury pursuant to CALIC No. 3.00 on the definition of "principals" and that, "[w]hen the crime charged is murder, the aider and

24

abettor's guilt is determined by the combined acts of all the participants as well as that person[']s own mental state. If the aider and abettor's mental state is more culpable than that of the actual perpetrator, that person's guilt may be greater than that of the actual perpetrator. Similarly, the aider and abettor's guilt may be less than the perpetrator's, if the aider and abettor has a less culpable mental state." The trial court also instructed the jury on direct aider and abettor liability pursuant to CALJIC No. 3.01.[10]

Senon originally argued on appeal that the trial court erred in failing to instruct the jury that it could find him "guilty, as an aider and abettor, of second degree murder even though the actual perpetrator of the murder was guilty of murder in the first degree." Since he filed his briefs, however, the Supreme Court decided *People v. Chiu* (2014) 59 Cal.4th 155, which addressed the issue of whether and in what circumstances a defendant can be convicted of first degree murder as an aider and abettor under the natural and probable consequences theory.[11] The Supreme Court's decision in *Chiu*, which we are

---

[10]     CALJIC No. 3.01 provided: "A person aids and abets the commission of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice, aids, promotes, encourages or instigates the commission of the crime.

"A person who aids and abets the commission of a crime need not be present at the scene of the crime. [¶] Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting. [¶] Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense. [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting."

The court also instructed the jury that conviction of murder required a concurrence of act and specific intent. (CALJIC No. 3.31.) It instructed the jury on the definition of murder (CALJIC No. 8.10), malice aforethought (CALJIC No. 8.11), deliberate and premeditated murder (CALJIC No. 8.20), unpremeditated second degree murder (CALJIC No. 8.30), second degree murder resulting from an unlawful act dangerous to life (CALJIC No. 8.31), and the jury's duty to find the degree of murder (CALJIC No. 8.70).

[11]     The parties submitted supplemental letter briefs on the Supreme Court's decision in *Chiu*.

25

bound to follow, compels a reversal and possible retrial of Senon's conviction for first degree murder.

Summarizing the general principles behind the natural and probable consequences doctrine, the Supreme Court in *Chiu* stated: "'"A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime."' [Citation.] 'Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault.' [Citation.] [¶] A nontarget offense is a '"natural and probable consequence' of the target offense if, judged objectively, the additional offense was reasonably foreseeable. [Citation.] The inquiry does not depend on whether the aider and abettor actually foresaw the nontarget offense. [Citation.] Rather, liability '"is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted."' [Citation.] Reasonable foreseeability 'is a factual issue to be resolved by the jury.' [Citation.]" (*People v. Chiu*, *supra*, 59 Cal.4th at pp. 161-162.) The Supreme Court noted, however, that it had "not previously considered how to instruct the jury on aider and abettor liability for first degree premeditated murder under the natural and probable consequences doctrine." (*Id*. at p. 162.)

The Supreme Court observed that, under the natural and probable consequences doctrine, "'[b]ecause the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime.' [Citation.]" (*People v. Chiu*, *supra*, 59 Cal.4th at p. 164.) Thus, because "the application of the natural and probable consequences doctrine [does not] depend[] on the foreseeability of every element of the nontarget offense," "in the context of murder under the natural and probable consequences doctrine, cases have focused on the reasonable

26

foreseeability of the actual resulting harm or the criminal act that caused that harm. [Citations.]" (*Id*. at p. 165.)

"In the context of murder," the Supreme Court explained, "the natural and probable consequences doctrine serves the legitimate public policy concern of deterring aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing. A primary rationale for punishing such aiders and abettors—to deter them from aiding or encouraging the commission of offenses—is served by holding them culpable for the perpetrator's commission of the nontarget offense of second degree murder. [Citation.] It is also consistent with reasonable concepts of culpability. Aider and abettor liability under the natural and probable consequences doctrine does not require assistance with or actual knowledge and intent relating to the nontarget offense, nor subjective foreseeability of either that offense or the perpetrator's state of mind in committing it. [Citation.] It only requires that under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the nontarget offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant. [Citation.]" (*People v. Chiu*, *supra*, 59 Cal.4th at pp. 165-166.)

The Supreme Court observed, "[h]owever, this same public policy concern loses its force in the context of a defendant's liability as an aider and abettor of a first degree premeditated murder. First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty. [Citation.] That mental state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death. [Citations.] Additionally, whether a direct perpetrator commits a nontarget offense of murder with or without premeditation and deliberation has no effect on the resultant harm. The victim has been killed regardless of the perpetrator's premeditative mental state. Although we have stated that an aider and abettor's

27

'punishment need not be finely calibrated to the criminal's mens rea' [citation], the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved and the above-stated public policy concern of deterrence." (*People v. Chiu*, *supra*, 59 Cal.4th at p. 166.)  For these reasons, the Supreme Court held "that punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine.  We further hold that where the direct perpetrator is guilty of first degree premeditated murder, the legitimate public policy considerations of deterrence and culpability would not be served by allowing a defendant to be convicted of that greater offense under the natural and probable consequences doctrine." (*Ibid*.)

The Supreme Court added that "[a]iders and abettors may still be convicted of first degree premeditated murder based on direct aiding and abetting principles.  [Citation.]  Under those principles, the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission.  [Citation.]  Because the mental state component—consisting of intent and knowledge—extends to the entire crime, it preserves the distinction between assisting the predicate crime of second degree murder and assisting the greater offense of first degree premeditated murder.  [Citations.]  An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent.  Such an aider and abettor, then, acts with the mens rea required for first degree murder." (*People v. Chiu*, *supra*, 59 Cal.4th at pp. 166-167.)

Finally, the Supreme Court addressed the issue of prejudice.  The instructions in *Chiu* allowed the jury to convict the defendant either as a direct aider and abettor or under

28

the natural and probable consequences doctrine.[12] (*People v. Chiu*, *supra*, 59 Cal.4th at pp. 160, 167.) The record in that case suggested that the jury based its verdict on the natural and probable consequences doctrine. (*Id*. at pp. 167-168.) Because the Supreme Court could not conclude beyond a reasonable doubt that the defendant's first degree murder conviction was based on a legally valid theory, the Supreme Court determined that the proper remedy was to reverse the defendant's first degree murder conviction and to give the People the option of accepting a reduction in the conviction to second degree murder or retrying the case. (*Id*. at p. 168.)

The People acknowledge that the instructions the trial court gave here contained the same flaw as the instructions in *Chiu*: They allowed the jury to convict Senon of first degree murder as an aider and abettor under the natural and probable consequences doctrine. The People concede that, "as in *Chiu*, the jury was erroneously instructed that it could find a guilty verdict of 'murder' based on the natural and probable consequence of aiding and abetting. [Citations.] This improperly allowed the jury to find that a defendant was guilty of first degree premeditated murder as a natural and probable consequence of an assault likely to produce great bodily injury."

The People argue, however, that the instructional error under *Chiu* was harmless because the evidence of the rules of the Mexican Mafia showed that Daniel could not have shot Johnny without Senon's permission and encouragement. Had Daniel done so, Daniel would have broken Mexican Mafia rules, he would have been subject to punishment including death, and Senon would not have socialized with Daniel and his family after the shooting. Officer Maldonado and defense gang expert Alfonso testified that killing someone in the presence of a member of the Mexican Mafia without prior permission could earn the killer a death sentence. From this evidence, the People assert that "if the jury found that Daniel was guilty of premeditated murder, it necessarily found

---

[12]     The instructions in *Chiu* were different than the instructions here because they were based on the judicial council-approved form in CALCRIM rather than CALJIC.

that Senon was guilty of directly aiding and abetting the premeditated murder, not an assault."

Perhaps, but not necessarily so. The evidence of Mexican Mafia rules does support the People's contention that the jury could have found Senon guilty of first degree premeditated murder on a direct aiding and abetting theory that he "aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*People v. Chiu*, *supra*, 59 Cal.4th at p. 167.) The evidence, however, also supports a finding that Senon and Daniel went into Tamble's office to assault but not kill Johnny, that Daniel did not decide to kill Johnny until Johnny and Garcia fought back, and that Senon did not approve of Daniel's actions (thereby sparing Daniel's life) until after the shooting. If the jury found that Senon only intended an assault, then his conviction of first degree murder under the natural and probable consequences doctrine cannot stand under *Chiu*.

The People argued both theories of liability to the jury. The prosecutor argued, in support of a direct aiding and abetting theory, that Senon's actions of calling Daniel to the Wilmington Inn and leaving Torres down the street in a place of safety showed "he is planning to do something he doesn't want her there for. Think about that. That right there tells you that he is premeditating this entire thing. He doesn't need to take her around the corner to go slap somebody around." The prosecutor argued that after Senon left Torres and returned to the Wilmington Inn, there was "a series of actions that the defendants undertook that tells you what was going on [in] their heads and tells you that they deliberated and premeditated." The prosecutor also argued, however, in support of a natural consequences aiding and abetting theory. The prosecutor told the jury that, in order to convict Senon of first degree murder, "you don't even have to have intended to aid and abet the murder. . . . All the defendant needs to have done is intended to aid and abet the assault. If, under all the circumstances, the murder ended up being a natural and probable consequence of the assault or an assault with a firearm." Therefore, the prosecutor argued, "[i]f Senon Grajeda intended nothing but to help Daniel Grajeda go in

30

and . . . do a shooting, or have the two of them go in and commit a beat-down, a slap-down together, if that was his intent, that's all enough, if under the circumstance it would be natural and probable foreseeable that a murder would result."

Although it is possible that the jury may have based its verdict on a direct aiding and abetting theory, rather than the natural and probable consequences theory, we cannot conclude beyond a reasonable doubt that the jury did so. (See *People v. Chiu*, *supra*, 59 Cal.4th at p. 167 ["[d]efendant's first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder"].) Pursuant to the Supreme Court's decision in *Chiu*, we must reverse Senon's first degree murder conviction and allow the People the choice of accepting a reduction of Senon's conviction to second degree murder or retrying the case.[13]

### D. *Denial of Severance*

Daniel contends that "[t]he confluence of prejudice arising from the trial court's erroneous denials of [his] interrelated motions for severance, for exclusion of Mexican Mafia gang evidence, and for new trial" violated his rights to due process and a fair trial and requires reversal of the judgment. We find no abuse of discretion in the trial court's rulings and no due process violation.

#### 1. Proceedings in the trial court

Prior to trial, counsel for Daniel stated that he had learned the prosecutor intended to introduce Enriquez's testimony regarding Senon's involvement with the Mexican

---

[13] A reduction of Senon's conviction to second degree murder will reduce his sentence for murder from 75 years to life to 45 years to life (Pen. Code, §§ 190, subd. (a), 667, subds. (b)-(i), 1170.12), plus an additional 25 years to life for the intentional discharge of a firearm (*id*., § 12022.53, subd. (d)) and 10 years for the two prior serious felony convictions (*id*., § 667, subd. (a)(1)), for a total term of imprisonment of 80 years to life rather than 110 years to life.

Mafia, which counsel contended did not apply to Daniel. The prosecutor responded that "there are no statements that I am going to use that would require a dual jury. But . . . we did have Mr. Enriquez tell us about admissions that Mr. [Senon] Grajeda had made, discussing Mafia business, discussing specific incidents where he had ordered violent things to happen, that sort of thing." When counsel for Daniel expressed concern that "this stuff is going to brush over on top of my client," the court stated that "that's the nature of evidence of gang allegations." Counsel for Daniel argued that Enriquez's proposed testimony about the Mexican Mafia did not apply to Daniel because Daniel was not a member of the Mexican Mafia and did not know Enriquez. After counsel clarified that he was objecting to the testimony under section 352, the court ruled that the evidence is more probative than prejudicial and overruled the objection.

The following day, counsel for Daniel filed a motion for separate trials, or in the alternative separate juries, on the ground that the jury would impute Enriquez's testimony about Senon's involvement with and actions on behalf of the Mexican Mafia to Daniel because of Daniel's "purported association with Senon." Counsel for Daniel argued that separate trials were necessary to avoid the danger that the jury would convict Daniel based on "spillover prejudice." The trial court denied the motion.

At the subsequent hearing on Senon's motions in limine to exclude Enriquez's testimony and to limit the number of gang experts, counsel for Daniel stated that, because the court was going to admit Enriquez's testimony under section 1101(b), counsel for Daniel was renewing his motion for separate trials. Counsel argued that it was "unduly prejudicial as to my client if [these] specific acts of conduct are going to be introduced into evidence . . . ." The prosecutor responded that, although Daniel was not a member of the Mexican Mafia, the evidence would show that Daniel was a member of the Westside Wilmas and committed the crime on behalf of the Mexican Mafia, which in turn elevated his status and the status of his gang within the Mexican Mafia. When the trial court again ruled that Enriquez's testimony would be admitted, counsel for Daniel asked the court to instruct the jury that Enriquez's statements were "not being introduced as direct evidence against my client." The court declined to give such an instruction.

32

Counsel for Daniel renewed his objection to Enriquez's testimony during trial. The trial court overruled the objections. Counsel also renewed his request for a limiting instruction that would instruct the jury not to consider the evidence against Daniel. The trial court again denied the request, noting that Enriquez's statements laid the foundation for the gang allegation.

After the jury returned its verdicts, Daniel moved for a new trial, based in part on the admission of Enriquez's testimony without a limiting instruction. The trial court denied the motion.

### 2. Severance

The "'Legislature has expressed a preference for joint trials. [Citation.] [Penal Code s]ection 1098 provides in pertinent part: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials." The court may, in its discretion, order separate trials if, among other reasons, there is an incriminating confession by one defendant that implicates a codefendant, or if the defendants will present conflicting defenses. [Citations.] Additionally, severance may be called for when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." [Citations.] [¶] We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared when the court ruled on the motion. [Citation.] If we conclude the trial court abused its discretion, reversal is required only if it is reasonably probable that the defendant would have obtained a more favorable result at a separate trial. [Citations.] If the court's joinder ruling was proper when it was made, however, we may reverse a judgment only on a showing that joinder "'resulted in "gross unfairness" amounting to a denial of due process.'" [Citation.]' [Citation.]" (*People v. Homick* (2012) 55 Cal.4th 816, 848; accord, *People v. Souza* (2012) 54 Cal.4th 90, 109; see *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 379.) "When defendants are charged with having committed 'common crimes involving common events and victims,'

33

as here, the court is presented with a "'classic case'" for a joint trial. [Citation.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40; accord, *People v. Bryant*, *supra*, 60 Cal.4th at p. 379.)

Daniel first argues that the trial court abused its discretion in denying his severance motions because Enriquez's testimony regarding Senon's uncharged offenses was not cross-admissible against Daniel in that "[w]hether or not Senon was a long-time member of the Mexican Mafia with a sordid history of violence had no tendency in reason to prove any disputed issue in the case against" Daniel. Cross-admissibility is one of the factors courts consider in determining whether severance of charges against a defendant is proper under Penal Code section 954. (*People v. McKinnon*, *supra*, 52 Cal.4th at p. 630; accord, *People v. Thomas* (2012) 53 Cal.4th 771, 798-799; see also *Calderon v. Superior Court* (2001) 87 Cal.App.4th 933, 938, 939 [finding Penal Code section 954 factors, including "whether evidence of the crimes would be cross-admissible," "instructive" on a Penal Code section 1098 motion where the crimes charged against multiple defendants occurred "on separate occasions"].)

Daniel's characterization of the evidence and issues here is inaccurate. As discussed, Enriquez's testimony was admissible to prove the gang allegations and motive, which were disputed issues in the case against Daniel as well as Senon. Enriquez explained that a Sureno like Daniel can enhance his stature and the stature of his gang by committing crimes sanctioned by the Mexican Mafia, and can increase his chances of becoming a member of the Mexican Mafia. Enriquez's testimony about Senon's gang activities explained to the jury the nature of the relationship between the Mexican Mafia and the Sureno gangs and the motives a Sureno like Daniel would have to commit crimes in order to advance up the ranks in the Mexican Mafia gang culture. Thus, the evidence was cross-admissible and did not require severance of Daniel's trial from Senon's. (See *People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 381 [severance of trial of two defendants from trial of the third defendant under Penal Code section 1098 was not required where "much evidence about which they complain would have been relevant even at a separate trial"]; *People v. Souza*, *supra*, 54 Cal.4th at p. 112 ["no evidence was

presented at the joint trial that would not have been presented at a separate trial"]; cf. *People v. Merriman*, *supra*, 60 Cal.4th at p. 38 ["[i]f the evidence underlying the joined charges would have been cross-admissible at hypothetical separate trials, 'that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges'"].)[14]

Daniel also argues that the evidence against him was weaker than the evidence against Senon, particularly the identification evidence, and that "the weak prosecution case against [him] shows that his conviction was undoubtedly tainted by his association with Senon Grajeda and not based solely on the evidence of his personal guilt." He relies on the principle that evidence that "improperly invites a finding of guilt by association . . . undermines the defendant's right to a fair trial." (*People v. Castaneda* (1997) 55 Cal.App.4th 1067, 1072.) This principle does not apply here.

In *People v. Castaneda*, *supra*, 55 Cal.App.4th 1067 the prosecutor presented expert testimony that "the typical heroin dealer" in the area "is usually Hispanic male adult." (*Id*. at p. 1072, italics omitted.) The defendant, who was charged only with possession of heroin, fit this profile. The court found that from the expert testimony "the jury was invited to infer that [the defendant] was actually guilty of a crime even greater than charged, that of selling heroin. An inappropriate and dangerous implication of this evidence was: Do not let this man free; he may have done more than possess heroin—he may be a heroin dealer. However, every defendant has the right to be tried based on

---

[14]    In a related argument, Daniel contends the admission of Enriquez's testimony about Senon's uncharged offenses deprived Daniel of a fair trial and due process of law. Daniel bases this argument on the prejudice inherent in gang evidence and the "patently prejudicial impact of the Mexican Mafia evidence . . . ." As noted, however, this evidence was admissible against both Senon and Daniel to prove the motivation for the murder and the elements of the gang allegation. (See *People v. Memory*, *supra*, 182 Cal.App.4th at p. 859; *People v. Ruiz*, *supra*, 62 Cal.App.4th at p. 240.) Admission of this evidence did not deprive Daniel of a fair trial. (See *People v. Garcia* (2008) 168 Cal.App.4th 261, 294 [properly admitted "gang-related evidence and gang expert testimony" "did not deprive [the defendant] of a fair trial"].)

35

evidence tying him to the specific crime charged, and not on general facts accumulated by law enforcement regarding a particular criminal profile. [Citations.]" (*Ibid*.) The expert testimony thus invited the jury to find the defendant "guilt[y] by association" and undermined his right to a fair trial. (*Ibid*.)

Here, unlike *Castaneda*, the challenged evidence was relevant to the crime charged: a gang-motivated murder. Both Daniel and Senon participated in the murder. Whether Daniel was tried separately or tried jointly with Senon, the jury would hear evidence about Senon and the Mexican Mafia, and Daniel's association with and relation to Senon, all of which was necessary to prove the crime charged. The "guilt by association" problem discussed in *Castaneda* was not present here. The challenged evidence was not an invitation to the jury to find Daniel guilty based solely on his association with Senon. (See *People v. Souza*, *supra*, 54 Cal.4th at p. 112 [severance properly denied where "no danger of . . . prejudicial association"].) As the Supreme Court recently stated in *People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th 335: "Whenever defendants are jointly tried, part of the prosecution's case will naturally attempt to establish that the defendants associated with each other, at least to the extent that they all participated in the crimes at issue. To some degree . . . '[w]hen many conspire, they invite mass trial by their conduct.' [Citation.] That defendants associated more broadly than their specific involvement in the alleged crimes may also be directly relevant to establishing their guilt. . . . [W]e [have] observed that evidence of the defendants' membership in a gang [does] not create improper guilt by association, but instead 'form[s] a significant evidentiary link in the chain of proof tying them to the crimes.' Moreover, it is also quite likely that different defendants participating together in a crime will have different levels of involvement and different personal backgrounds. These circumstances alone do not compel severance or render a joint trial grossly unfair. Individuals who choose to commit crimes together are not generally entitled to shield the true extent of their association by the expedient of demanding separate trials." (*Id.* at p. 383.)

36

Daniel further argues that his defense and Senon's defense were "irreconcilable in exactly the way that makes severance mandatory to preserve due process." Daniel's defense was misidentification, while Senon's defense was lack of participation in the shooting. Daniel contends that Senon's defense "implicitly incriminated" him because "[n]o reasonable juror could have disregarded Senon's admitted prior bad acts in determining whether [Daniel] acted in support of Senon who was present at the fatal shooting."

Severance may be appropriate when the defendants have conflicting or antagonistic defenses. (*People v. Homick*, *supra*, 55 Cal.4th at pp. 848, 850.) In order to obtain severance on this basis, a defendant must "'"'"demonstrate[] that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict *alone* demonstrates that both are guilty."' [Citation.] When, however, there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance." [Citation.]' [Citations.]" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1173; accord, *Homick*, *supra*, at p. 850.) As the Supreme Court explained in *People v. Byrant, Smith and Wheeler*, *supra*, 60 Cal.4th 335: "Simply because the prosecution's case will be stronger if defendants are tried together, or that one defense undermines another, does not render a joint trial unfair. [Citation.] Indeed, important concerns of public policy are served if a single jury is given a full and fair overview of the defendants' joint conduct and the assertions they make to defend against ensuing charges." (*Id.* at p. 379.)

We doubt that Senon's defense he was not involved in the shooting, and Daniel's defense he was not the person who came to the Wilmington Inn in the SUV and did the shooting, were so irreconcilable that the jury would convict Daniel based on that conflict alone. Certainly Senon, as a high-ranking member of the Mexican Mafia, had plenty of Surenos to do his bidding; it was not necessary that he select Daniel to do it. In any event, Daniel did not object and move for severance based on irreconcilable defenses, nor did he renew his motion to sever at any time during trial as the parties introduced

37

evidence relevant to the two defenses. Daniel therefore forfeited his claim that severance was required because of irreconcilable defenses. (See *People v. Lucas* (2014) 60 Cal.4th 153, 219 ["to the extent defendant argues that the court's pretrial consideration of defense evidence was relevant to show that a weak case was being joined with a strong one to his prejudice, that claim is forfeited because defendant passed on the opportunity to renew such a claim after presenting his evidence at trial"]; *People v. Homick*, *supra*, 55 Cal.4th at p. 848, fn. 21 ["'[d]efendant has forfeited this issue on appeal because he failed to assert this ground at the time his severance motion was heard,'" and "'[i]f further developments occur during trial that a defendant believes justify severance, he must renew his motion to sever'"].)

### 3. New Trial

"'"'"We review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard.' [Citations.] '"A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion."'"' [Citation.]' [Citation.]" (*People v. McCurdy*, *supra*, 59 Cal.4th at p. 1108.)

The basis of Daniel's argument that the trial court erred in denying his motion for a new trial is the same as the basis of his argument that the trial court erred in denying his motion for a trial severance. We find no abuse of discretion in the trial court's denial of Daniel's new trial motion for the same reasons. We similarly reject Daniel's claim of cumulative error. (See *People v. Trinh* (2014) 59 Cal.4th 216, 253 ["[c]onsistent with our review of defendant's individual claims, we find no cumulative error occurred"]; *People v. Avila* (2014) 59 Cal.4th 496, 520 [no cumulative error where "there was no error to accumulate"].)

### E. *Failure To Instruct Sua Sponte with CALJIC No. 8.71*

Daniel argues that the trial court had a sua sponte obligation to give CALJIC No. 8.71, and that the court's failure to do so constituted reversible error. CALJIC

No. 8.71 provides: "If any juror is convinced beyond a reasonable doubt that the crime of murder has been committed by a defendant, but has a reasonable doubt whether the murder was of the first or of the second degree, that juror must give defendant the benefit of that doubt and find that the murder is of the second degree."

The trial court instructed the jury on the definition of murder (CALJIC No. 8.10), the definition of malice aforethought (CALJIC No. 8.11), and deliberate and premeditated murder (CALJIC No. 8.20). The court instructed the jury pursuant to CALJIC No. 8.30 that "[m]urder of the second degree is also the unlawful killing of a human being with malice aforethought when the perpetrator intended unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation." The trial court further instructed the jury pursuant to CALJIC No. 8.70: "Murder is classified into two degrees. If you should find the defendant guilty of murder, you must determine and state in your verdict whether you find the murder to be of the first or second degree." The court also instructed the jury pursuant to CALJIC No. 8.74: "Before you may return a verdict in this case, you must agree unanimously not only as to whether the defendant is guilty or not guilty, but also, if you should find him guilty of an unlawful killing, you must agree unanimously as to whether he is guilty of murder of the first degree or murder of the second degree. [¶] However, you are not required to agree unanimously on the theory of guilt."

The trial court, however, refused to instruct the jury pursuant to CALJIC No. 8.75, which instructs the jury that if it is unable to reach a unanimous decision as to first degree murder, it must find the defendant not guilty of first degree murder before it can find the defendant guilty of second degree murder. The court explained that CALJIC No. "8.75 is a *Stone* instruction, I don't like to give a *Stone* instruction . . . ."**15**

---

**15**    In *Stone v. Superior Court* (1982) 31 Cal.3d 503 the Supreme Court held that "the trial court is constitutionally obligated to afford the jury an opportunity to render a partial verdict of acquittal on a greater offense when the jury is deadlocked only on an uncharged lesser included offense. Failure to do so will cause a subsequently declared mistrial to be without legal necessity" for double jeopardy purposes. (*Id.* at p. 519.)

In *People v. Moore* (2011) 51 Cal.4th 386, on which Daniel relies, the trial court instructed the jury with a prior version of CALJIC No. 8.71, which read: "'If you are convinced beyond a reasonable doubt and unanimously agree that the crime of murder has been committed by a defendant, but you unanimously agree that you have a reasonable doubt whether the murder was of the first or of the second degree, you must give defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree.'" (*Id.* at p. 409, italics omitted.) The Supreme Court disapproved of the use of this instruction and of CALJIC No. 8.72, which contained similar language, explaining that these "instructions carry at least some potential for confusing jurors about the role of their individual judgments in deciding between first and second degree murder, and between murder and manslaughter. The references to unanimity in these instructions were presumably added to convey the principle that the jury as a whole may not return a verdict for a lesser included offense unless it first reaches an acquittal on the charged greater offense. [Citation.] But inserting this language into CALJIC Nos. 8.71 and 8.72, which address the role of reasonable doubt in choosing between greater and lesser homicide offenses, was unnecessary, as CALJIC No. 8.75 fully explains that the jury must unanimously agree to not guilty verdicts on the greater homicide offenses before the jury as a whole may return verdicts on the lesser." (*Id.* at pp. 411-412, fn. omitted.)

*Moore* does not support Daniel's contention that the trial court has a sua sponte duty to instruct the jury pursuant to CALJIC No. 8.71. Nor does it hold that CALJIC No. 8.75 must be given if CALJIC No. 8.71 is not. The Supreme Court in *Moore* emphasized that the potential for confusion is the role of a juror's individual judgment, not the necessity of an instruction regarding how to approach the task of determining whether the defendant is guilty of first or second degree murder.

In *People v. Hinton* (2006) 37 Cal.4th 839, on which the People rely, the trial court instructed the jury pursuant to CALJIC Nos. 8.30 and 8.75, but it did not give CALJIC Nos. 8.70 and 8.71. The defendant argued that, without the latter two instructions, "the jury would not have understood 'how doubts about the proper

40

offense—first degree murder or second degree murder—should be resolved.'" (*Hinton*, *supra*, at p. 883.) The Supreme Court disagreed, pointing out that "[i]n addition to CALJIC No. 8.75, which directed the jury to consider second degree murder if it was unable to find defendant guilty unanimously and beyond a reasonable doubt of first degree murder, the jury was instructed that a guilty verdict required unanimous agreement that defendant's guilt of the crime had been established beyond a reasonable doubt. Considering these instructions as a whole [citation], the jury was adequately instructed as to the significance of a reasonable doubt as to defendant's guilt of first degree murder and the availability of second degree murder as a lesser offense." (*Ibid.*)

No case has held that the trial court has a sua sponte duty to give CALJIC No. 8.71,[16] and we decline to do so here. *Moore* and *Hinton* instruct us to look at the instructions as a whole to determine whether the instructions adequately informed the jury "as to the significance of a reasonable doubt as to defendant's guilt of first degree murder and the availability of second degree murder as a lesser offense." (*People v. Hinton*, *supra*, 37 Cal.4th at p. 883.) The instructions here told the jury that murder is of the second degree if "the evidence is insufficient to prove deliberation and premeditation." (CALJIC No. 8.30.) If the jury found the defendants guilty of murder, then the jury had to determine whether the murder was of the first or second degree. (CALJIC No. 8.70.) The jury had to "agree unanimously not only as to whether the defendant is guilty or not guilty, but also, . . . as to whether he is guilty of murder of the first degree or murder of the second degree." (CALJIC No. 8.74.) The jury was also given the standard instruction on the People's burden to prove guilt beyond a reasonable doubt. (CALJIC No. 2.90.) Taken as a whole, these instructions adequately informed the jury that if it found Senon and Daniel guilty of murder but the People failed to prove beyond a reasonable doubt the premeditation and deliberation necessary for a first degree murder conviction, the jury could convict the two defendants of second degree murder.

---

**16**     Although the use note for CALJIC No. 8.71 states that the instruction should be given sua sponte.

41

F.      *Exclusion of Evidence of Third Party Culpability*

During counsel for Daniel's cross-examination of Detective Rodriguez, counsel attempted to elicit testimony that the gun used to kill Johnny was used in the commission of a crime that occurred while Daniel and Senon were in custody. The People objected, and the trial court asked for an offer of proof. Counsel for Daniel stated, "Well, I can show that I have a description of the shooter in the other case that comes very close to matching my client, about the same size, same height, same weight, facial tattoos, in another case." The trial court ruled that the offer of proof did not meet the standards of *People v. Hall* (1986) 41 Cal.3d 826, but stated that if counsel could meet those standards, he could raise the issue again.

In *People v. Hall*, *supra*, 41 Cal.3d at p. 833 the Supreme Court held that evidence of third party culpability for the charged crime "need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt." (See *People v. McWhorter* (2009) 47 Cal.4th 318, 368.) The "'holding [in *Hall*] did not, however, require the indiscriminate admission of any evidence offered to prove third-party culpability. The evidence must meet minimum standards of relevance: "evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." [Citation.]" (*Ibid.*) In addition, "[i]n assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under . . . section 352. [Citations.]" (*Id.* at pp. 367-368.)

Here, the proffered evidence that another gang member had subsequently used the same gun Daniel used did not meet the minimum standards of relevance or raise a reasonable doubt as to Daniel's guilt. The fact that a gang member who may have looked like Daniel used the same gun in a subsequent shooting does not, without more, raise a reasonable doubt as to Daniel's guilt. The other gang member may have received the gun

42

after the shooting in this case. Indeed, as Detective Rodriguez testified in response to questioning by counsel for Daniel, "one of the things that is common with gangs is [that] they will share things like cars or guns." Nor was there was any direct or circumstantial evidence connecting any such third party to the shooting in this case. The trial court did not abuse its discretion in excluding the evidence. (See *People v. Lucas*, *supra*, 60 Cal.4th at p. 280 [no error in excluding evidence of third party culpability where the connection "was speculative with no evidence, either direct or circumstantial"]; *People v. McWhorter*, *supra*, 47 Cal.4th at p. 372 [trial court properly excluded evidence of third party culpability where link "was entirely speculative"].)

### G.      *Penal Code Section 654*

Daniel argues that the trial court should have stayed his sentence on his conviction of felon in possession of a firearm pursuant to Penal Code section 654 (section 654) because his possession of the firearm was part of the same indivisible course of conduct as the shooting. California law does not support Daniel's argument.

"The California Supreme Court has stated: 'The test for determining whether section 654 prohibits multiple punishment has long been established: "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." [Citation.]'" (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1377; accord, *People v. Capistrano* (2014) 59 Cal.4th 830, 885.) "'On the other hand, if the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for the independent violations committed in pursuit of each objective even though the violations were parts of an otherwise indivisible course of conduct.' [Citation.]" (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1414; accord, *People v. Galvez* (2011) 195 Cal.App.4th 1253, 1262-1263.)

43

"""The question whether . . . section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination. Its findings on this question must be upheld on appeal if there is any substantial evidence to support them." [Citation.]"" (*People v. Galvez*, *supra*, 195 Cal.App.4th at p. 1263.) "'We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence.' [Citation.]" (*People v. Ortiz*, *supra*, 208 Cal.App.4th at p. 1378.)

"In cases involving firearms and multiple punishment issues, a section 654, subdivision (a) violation has been held to occur in an unusual factual scenario. Section 654, subdivision (a) has been held to apply when fortuitous circumstances place the firearm in the accused's hands only at the instant of the commission of another offense. (*People v. Bradford* (1976) 17 Cal.3d 8, 21-23 . . . ; *People v. Venegas* (1970) 10 Cal.App.3d 814, 818-821 . . . .) For example in *Bradford*, after robbing a bank and driving away in a car, a state traffic officer stopped the defendant for speeding. The defendant then struggled with the officer. The defendant got control of the gun during the struggle and fired shots at the officer. In concluding section 654 barred multiple sentencing for the assault and weapons possession, our Supreme Court explained, 'Defendant's possession of [the officer's] revolver was not "antecedent and separate" from his use of the revolver in assaulting the officer.' [Citations.] In *Venegas*, the victim pulled a gun and a struggle ensued with the defendant. During the struggle, the defendant shot the victim. [Citation.] The Court of Appeal held: 'Here the evidence shows a possession only at the time defendant shot [the victim]. Not only was the possession physically simultaneous, but the possession was incidental to only one objective, namely to shoot [the victim].' [Citations.] Our colleagues in Division Two of the Fourth Appellate District synthesized the holdings in *Bradford* and *Venegas* thusly, 'From *Bradford* and *Venegas*, we distill the principle that if the evidence demonstrates at most that fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense, section 654 will bar a separate punishment for the

44

possession of the weapon by an ex-felon.' [Citations.]" (*People v. Garcia* (2008) 167 Cal.App.4th 1550, 1565; see *People v. Wynn* (2010) 184 Cal.App.4th 1210, 1217 ["courts have determined that section 654 applies where the defendant obtained the prohibited weapon *during* the assault in which he used the weapon," but not "when the weapon possession preceded the assault"].)

Here, the evidence showed that Daniel arrived at the Wilmington Inn with a gun in his waistband, used the gun to shoot Johnny, and then left with the gun. The evidence does not show that the gun fortuitously appeared in Daniel's hand before he shot Johnny, and there was no evidence that Daniel left the gun at the scene when he departed. Section 654 did not bar his sentence for being a felon in possession of a firearm. (See *People v. Rosas* (2010) 191 Cal.App.4th 107, 111 ["no 'fortuitous circumstances' putting the weapon in [the defendant's] hand at the moment of the other offenses such that the act of possession might in some meaningful way be indistinguishable from the two attempted murders"].)

### H. *Sentence for Possession of a Firearm by a Felon*

The trial court imposed a five-year gang enhancement under Penal Code section 186.22, subdivision (b)(1)(B), on Daniel's conviction for possession of a firearm by a felon (*id.*, § 12021, subd. (a)(1)). We agree with Daniel's argument, and the People's concession, that this was error.

Penal Code section 186.22, subdivision (b)(1), provides that any person who is convicted of a felony committed for the benefit of a criminal street gang "shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony . . . of which he or she has been convicted, be punished as follows: [¶] (A) Except as provided in subparagraphs (B) and (C), the person shall be punished by an additional term of two, three, or four years at the court's discretion. [¶] (B) If the felony is a serious felony, as defined in subdivision (c) of Section 1192.7, the person shall be punished by an additional term of five years."

45

Possession of a firearm by a felon is not a serious felony under subdivision (c) of Penal Code section 1192.7. Where committed for the benefit of a criminal street gang, however, it becomes a serious felony under subdivision (c)(28), which includes "any felony offense, which would also constitute a felony violation of Section 186.22." (Pen. Code, § 1192.7, subd. (c)(28).) In *People v. Briceno* (2004) 34 Cal.4th 451 the Supreme Court held that Penal Code section 186.22, subdivision (b)(1)(A)-(C), refers to the current proceeding, while Penal Code section 1192.7, subdivision (c), "comes into play only if the defendant reoffends, at which time any *prior* felony that is gang related is deemed a serious felony. Thus, any felony that is gang related is not treated as a serious felony in the current proceeding," making subdivision (b)(1)(A) of section 186.22 the applicable sentencing provision. (*Briceno*, *supra*, at p. 465.) Because a violation of Penal Code section 12021[17] only became a serious felony when it was enhanced under section 186.22, subdivision (b)(1), it was not subject to the five-year enhancement mandated by subdivision (b)(1)(B) of section 186.22. (*Briceno*, *supra*, at p. 465; cf. *People v. Garcia*, *supra*, 167 Cal.App.4th at p. 1563.) Therefore the five-year enhancement imposed under Penal Code section 186.22, subdivision (b)(1)(B), must be stricken, and the matter must be remanded for resentencing under subdivision (b)(1)(A) of Penal Code section 186.22.

---

[17] This statute was repealed January 1, 2012. (Stats. 2010, ch. 711, § 4.) See now Penal Code section 29800.

## DISPOSITION

Senon's conviction for first degree murder is reversed, and the trial court is directed to give the People the option of accepting a reduction in the conviction to second degree murder or retrying the case against Senon.  The five-year enhancement imposed on Daniel's conviction of possession of a firearm by a felon under Penal Code section 186.22, subdivision (b)(1)(B), is stricken, and the matter is remanded for resentencing on count 2 under subdivision (b)(1)(A) of Penal Code section 186.22.  In all other respects, the judgments are affirmed.


SEGAL, J.[*]


We concur:


PERLUSS, P. J.


WOODS, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.